

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:25-cr-210 |
| v. | Count 1: 18 U.S.C. § 1343 (Wire Fraud) |
| IBRAHEEM SABRI SAMIRAH | |
| *Defendant.* | **Forfeiture Notice** |

**INFORMATION**

THE UNITED STATES CHARGES THAT:

**INTRODUCTORY ALLEGATIONS**

At all times relevant to the information, unless otherwise stated:

1. Defendant IBRAHEEM SABRI SAMIRAH (hereafter "SAMIRAH") resided in Herndon, Virginia, which was within the Eastern District of Virginia.

2. On September 30, 2019, Nova Healthy Smiles PLLC (NHS) was formed in the Commonwealth of Virginia, with the principal office address in Herndon, Virginia—the address for SAMIRAH's residence at the time. In September 2020, NHS's address was updated to Samirah's new residential address in Herndon, Virginia.

3. Sonabank, later renamed Primis Bank, provided a range of traditional banking services throughout the United States, including in the Eastern District of Virginia, and was a financial institution as defined by Title 18, United States Code, Section 20. Sonabank was headquartered in Glen Allen, Virginia.

2

## The CARES Act and PPP

4.  The Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

5.  In or around March 2020, Congress made government-guaranteed loans available to qualified small businesses through the Paycheck Protection Program ("PPP"). The purpose of loans issued under the PPP was to enable small businesses suffering from the economic downturn to continue to pay salary or wages to their employees. To qualify for a loan under the PPP, an applicant had to meet certain criteria, including, among other things, that it was in operation on February 15, 2020, and either had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on an IRS Form 1099-MISC. Moreover, the amount of the loan that could be approved under the PPP and implementing regulations typically was a function of the applicant's historical payroll costs.

6.  Small businesses applied for PPP loans with private lenders, including financial institutions such as Sonabank, that had been approved to participate in the program by the SBA. As such, Sonabank was authorized to lend funds to eligible borrowers under the terms of the PPP. The lenders, including Sonabank, used their own funds to make the PPP loans, but the loans were guaranteed 100 percent by the SBA.

7.  In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business, to a participating financial institution. The PPP loan application required the business (through its

authorized representative) to acknowledge the program rules and make certain affirmative certifications. In the PPP loan application, the small business (through its authorized representative) had to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used by the lender to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses. The supporting documentation often included bank account records and IRS Forms, including the IRS Schedule C (Form 1040), Profit or Loss Form Business, which reports a sole proprietorship's income and expenses. The applicant also needed to certify that the business was in operation as of February 15, 2020, that the PPP loan would be used to pay payroll, mortgage payments, lease payments, and utility payments as required by the PPP rules, and that all information in the application supporting document was true and accurate. The lenders relied on the accuracy of the information contained in the PPP applications and supporting documents.

8. The proceeds of a PPP loan could be used only for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, mortgage interest payments (but not mortgage prepayments or principal payments), rent payments, utility payments, interest payments on debt obligations that were incurred before February 15, 2020, or for refinancing certain specified SBA loans.

9. The PPP allowed the interest and principal on the PPP loans to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses. To receive PPP loan forgiveness, a qualifying business was required to submit a PPP loan forgiveness application, which was signed by an authorized representative of the business, to its PPP lender. In the PPP

loan forgiveness application, the borrower (through its authorized representative) had to certify, among other things, that it complied with all the requirements in the PPP rules, including the rules related to eligible uses of PPP loan proceeds, and that the information provided in the application was true and correct in all material respects. The lenders relied on the accuracy of the information contained in the PPP forgiveness applications and supporting documents.

10. The SBA received PPP forgiveness applications from PPP lenders through a cloud-based platform, known as Summit, through an Amazon Web Services GovCloud server located in Oregon. The SBA transmits the forgiveness payments from the SBA to the PPP lender through the FMS system to the Treasury. The primary server for FMS is in Sterling, VA.

## COUNT ONE
### (Wire Fraud)

11. The allegations contained paragraphs 1 through 12 of this Indictment are realleged and incorporated by reference as if set forth fully herein.

12. From in or about May 2020 to on or about August 2021, in the Eastern District of Virginia and elsewhere, the defendant,

**IBRAHEEM SAMIRAH**

having knowingly devised and intending to devise a scheme and artifice to defraud Sonabank and the SBA, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

*Purpose and Objects of the Scheme and Artifice to Defraud*

13. It was a purpose and object of the scheme and artifice to defraud for SAMIRAH to unlawfully enrich himself by, among other things: (a) submitting and causing the submission of

false and fraudulent PPP loan application to Sonabank; (b) obtaining money or property – that is, PPP loan proceeds of Sonabank and the SBA; (c) falsely promising to use the loan proceeds on permitted business expenses under the PPP; and (d) concealing and causing the concealment of the scheme.

*Ways, Manner, and Means of the Scheme and Artifice to Defraud*

14. On or about May 12, 2020, SAMIRAH applied for and was approved for a PPP loan of approximately $83,300 from Sonabank. The loan was for NHS, located in Herndon, Virginia.

15. In support of the loan, SAMIRAH submitted a signed "Borrower Application Form" (SBA Form 2483). On the form, SAMIRAH falsely represented that NHS had four employees and an average monthly payroll of $33,333.32. SAMIRAH further represented that the purpose of the loan was for payroll, lease/mortgage interest, and utilities.

16. On the Borrower Application Form, SAMIRAH falsely agreed to several certifications.

17. SAMIRAH falsely certified that NHS "had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC." He further falsely certified that "[t]he funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule." Finally, SAMIRAH certified "that the information provided in th[e] application and the information provided in all supporting documents and forms is true and accurate in all material respects."

18. SAMIRAH submitted supporting documents with the PPP loan application, including W-4 forms (Employee's Withholding Certificate), Payroll Journals, and Paychex payroll

reports for January and February 2020. These documents listed four employees of NHS: SAMIRAH, Employee 1, Employee 2, and Employee 3. The Payroll Journals and Paychex payroll reports stated that NHS paid each of the purported employees $8,333.33 per month in January and February 2020 (of which they each received a net monthly paycheck for $7,695.83), resulting in total salary payments of $33,333.32 for each month.

19. SAMIRAH falsely represented that NHS paid four purported employees' payroll in January 2020 and February 2020, when in truth and fact, NHS did not run payroll journals for those periods until May 2020. None of the four purported employees received funds from NHS prior to May 2020.

20. SAMIRAH wrote checks to NHS' purported employees from NHS's business account in May and June 2020. Although these checks appeared to represent the purported employees' salary payments, the purported employees transferred the money back to SAMIRAH.

21. On or about August 16, 2021, SAMIRAH electronically signed and transmitted the PPP forgiveness application for NHS to Sonabank. Sonabank then submitted the PPP forgiveness application to the SBA's cloud-based platform, Summit, via a cloud server located in Oregon.

22. The NHS PPP forgiveness application falsely represented the material fact that NHS had spent all of the PPP loan proceeds on permissible business expenses, when in truth and in fact, as the defendant well knew then, the NHS had not spent the PPP loan proceeds on permissible business expenses, with the exception of employer payroll taxes that were remitted to the Internal Revenue Service.

### *Wires in Furtherance*

23. On or about August 16, 2021, within the Eastern District of Virginia and elsewhere, the defendant, for the purpose of executing the scheme and artifice to defraud, and to aid and abet

the same, transmitted and caused to be transmitted by means of wire communications in interstate commerce writings, signs, signals and sounds by means of wire communications in interstate commerce, to wit: the defendant caused the electronic transmission of the PPP loan forgiveness application for NHS from Eastern District of Virginia to the State of Oregon, falsely representing the material fact that NHS had spent the PPP loan proceeds on permissible expenses, when in truth and in fact, as the defendant well knew then, NHS had not spent the PPP loan proceeds on permissible business expenses.

(All in violation of Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE NOTICE

Pursuant to Federal Rule of Criminal Procedure 32.2(a), defendant **IBRAHEEM SABRI SAMIRAH** is hereby notified that upon conviction of the offense alleged in Count 1 (wire fraud) of the Criminal Information, **IBRAHEEM SABRI SAMIRAH** shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, any property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as the result of the violation.

Pursuant to Federal Rule of Criminal Procedure 32.2(a), defendant **IBRAHEEM SABRI SAMIRAH** is hereby notified that upon conviction of the offense alleged in Count 1 of the Criminal Information, **IBRAHEEM SABRI SAMIRAH** shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, constituting or derived from proceeds traceable to the offense.

Pursuant to 21 U.S.C. § 853(p), **IBRAHEEM SABRI SAMIRAH** shall forfeit substitute property, if, by any act or omission of **IBRAHEEM SABRI SAMIRAH**, the property referenced above cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 21 United States Code, Section 853(p); Title 28 United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

ERIK S. SIEBERT
UNITED STATES ATTORNEY

*Kathleen Robeson* (signature)

Kathleen E. Robeson
Assistant United States Attorney